[No. 3827-1-III.  Division Three.  February 17, 1981.]

SUSAN JO YAMAUCHI, *Respondent,* v. THE DEPARTMENT OF EMPLOYMENT SECURITY, *Appellant.*

428

*Kenneth O. Eikenberry, Attorney General,* and *Matthew J. Coyle* and *Bryan Fischnaller, Assistants,* for appellant.

*Larry J. Butler,* for respondent.

McInturff, C.J.—The State Employment Security Department (department) appeals a judgment of the Superior Court reversing a decision of the department commissioner which denied Susan Jo Yamauchi benefits pursuant to RCW 50.20.050(1).[1]

Ms. Yamauchi was employed by the Franklin County Public Utility District from June 1974 until voluntarily terminating her employment on April 21, 1978. This termination was due to her forthcoming marriage on April 29, 1978, and the necessity of relocating in Spokane, where her future husband resided and was self-employed. After the marriage ceremony in Spokane, Ms. Yamauchi applied for unemployment insurance benefits.[2] She received approximately $357 compensation from May 6 through May 20, 1978; however, on July 10, 1978, the department issued a determination notice denying her benefits on the ground she left work voluntarily without good cause and sought repayment of the monies tendered. RCW 50.20.050 disqualifies an individual from recovering unemployment benefits for up to 10 weeks if the applicant is determined to have left work voluntarily without good cause.

Ms. Yamauchi appealed the determination notice. After review of the entire record by the department commissioner, the decision was affirmed based upon the rationale that voluntary termination of employment in preparation for marriage is not cognizable as "good cause" within the purview of unemployment compensation under the Employment Security Act. RCW 50.20.

Ms. Yamauchi appealed that decision to the superior court. The court, applying the "error of law" standard,

---

[1]RCW 50.20.050(1) provides:

"An individual shall be disqualified from benefits beginning with the first day of the calendar week in which he or she has left work *voluntarily without good cause* and thereafter until he or she has obtained work and earned wages of not less than his or her suspended weekly benefit amount in each of five calendar weeks." (Italics ours.)

[2]The day prior to her marriage, Ms. Yamauchi attempted to apply for unemployment benefits at the Pasco Job Service Center.

RCW 34.04.130(6)(d), determined Ms. Yamauchi satisfied either the "marital status" or "domestic responsibilities" exception contained in RCW 50.20.050(4) which states, in pertinent part: "this section shall not apply to an individual whose *marital status or domestic responsibilities* cause him or her to leave employment." (Italics ours.)

The central issue is whether a person who voluntarily terminates employment in anticipation of marriage and to follow her prospective spouse to a new jurisdiction is eligible for unemployment compensation under the "marital status and domestic responsibilities" exception to RCW 50.20.050.

In accepting an appeal from an agency decision we apply the appropriate standard of review directly to the administrative record, not to the findings or conclusions of the court. The disposition of the case at bench turns upon statutory interpretation, consequently the "error of law" standard is applicable. *Leschi Improvement Council v. State Highway Comm'n,* 84 Wn.2d 271, 283, 525 P.2d 774 (1974); *State Ferries v. International Organization of Masters, Mates & Pilots,* 20 Wn. App. 887, 890, 584 P.2d 397 (1978); *Weyerhaeuser Co. v. Department of Revenue,* 16 Wn. App. 112, 114–15, 553 P.2d 1349 (1976). More recently the court has stated the error of law standard is to be used where there is dispute over the meaning of a statutory term. *See Brandley v. Department of Employment Security,* 23 Wn. App. 339, 342, 595 P.2d 565 (1979).

RCW 50.01.010, the preamble to the Employment Security Act, indicates employment benefits are intended to alleviate the economic insecurity arising from termination of employment, the prevention of which was beyond the employee's control. The act reflects legislative intent to lighten the burden of the unemployed worker and his or her family. Our courts have construed the "good cause" provision of RCW Title 50 to mean a compelling personal reason exists to voluntarily terminate employment. For one spouse to leave employment and go to the place of employment of the other spouse in order to preserve strong marital

and family relations has been considered a compelling personal reason. *Ayers v. Department of Employment Security,* 85 Wn.2d 550, 552–53, 536 P.2d 610 (1975) (husband terminating employment to join wife); *In re Bale,* 63 Wn.2d 83, 91, 385 P.2d 545 (1963) (wife terminating employment to join husband). Unemployment compensation was intended to protect individuals from the hardships of unemployment, the commencement of which involves a substantial degree of compulsion. In *Cowles Publishing Co. v. Department of Employment Security,* 15 Wn. App. 590, 593, 550 P.2d 712 (1976), the court noted:

> Unemployment benefits will be awarded to the voluntarily unemployed when the reason for unemployment is "compelling". A compelling reason is one which forces or constrains a person to quit her employment against her will.

(Footnotes omitted.)

We conclude Ms. Yamauchi voluntarily terminated her employment without the good cause necessary under RCW 50.20.050. In her "Claimant Interview Report" she stated: "I left on 4/21/[7]8 as I had things to do before the wedding." Ms. Yamauchi's decision to voluntarily terminate her employment a week before her wedding was one of personal convenience, not compelling personal reasons as contemplated by the act. She did not leave work to accompany or join her spouse, because she was not yet married. *See Ayers* and *In re Bale, supra.*

Two logical arguments are propounded in considering the gravamen of this case, *i.e.,* whether "marital status or domestic responsibility" should be extended beyond the actual state of marriage. In its oral opinion the trial court noted the preamble of RCW Title 50 (RCW 50.01.010) states the act is to be liberally construed for the purpose of reducing to a minimum involuntary unemployment and the concomitant economic suffering. The court cogently said:

> I believe the dictionary defines domestic as of or pertaining to the home, a household, household affairs or the family, and it appears to the court that what she did in

approximately a week from the time of quitting employment was in preparation to getting married. I would suggest that this is a domestic responsibility. It does pertain to the home, the household, household affairs, the family and I would suggest from the date of the marriage on she clearly falls within the interpretation of the exception based on marital status and/or domestic responsibilities evolving therefrom, . . .

The second argument details the need for a definite demarcation date with which administrators may more efficiently facilitate payment of benefits under the act. It is argued this bright line must be the date of marriage.

RCW 50.20.050(4) was enacted by the legislature,[3] subsequent to the *Ayers, Bale,* and *Cowles* decisions, to clarify compelling personal reasons which would qualify as good cause for voluntary termination of employment. The legislature is presumed to have in mind decisions of our Supreme Court when enacting statutes. *State v. Fenter,* 89 Wn.2d 57, 62, 569 P.2d 67 (1977); *Daly v. Chapman,* 85 Wn.2d 780, 782, 539 P.2d 831 (1975). The *Bale, Ayers* and *Cowles* cases, together with the subsequent amendment to RCW 50.20.050, reflect judicial and legislative concern for implementing a specific policy of providing economic stability for the unemployed worker and his or her family, providing those who voluntarily terminate employment for such reasons seek work actively for a 10–week period before they receive benefits.

In answer to the argued need for a definite date for entitlement under the act, the court noted:

---

[3]Laws of 1977, 1st Ex. Sess., ch. 33, § 4. RCW 50.20.050(4) provides:

"(4) Subsections (1) and (3) of this section shall not apply to an individual whose marital status or domestic responsibilities cause him or her to leave employment. Such an individual shall not be eligible for unemployment insurance benefits until he or she has requalified, either by obtaining work and earning wages of not less than the suspended weekly benefit amount in each of five calendar weeks or by reporting in person to the department during ten different calendar weeks and certifying on each occasion that he or she is ready, able, and willing to immediately accept any suitable work which may be offered, is actively seeking work pursuant to customary trade practices, and is utilizing such employment counseling and placement services as are available through the department.

> The argument, of course, made by the respondent that where do you set the time limits. . . . I think it's clear for a week, or the time you're getting beyond there, you start staying without a reasonable time to carry out domestic responsibility . . . [W]e must go on a case-to-case basis.

Since the term "marital status" is not defined in the statute, it will be given its ordinary meaning. *Tacoma Telco Fed. Credit Union v. Edwards*, 94 Wn.2d 666, 669, 619 P.2d 363 (1980). If the language of a statute is clear, the court should neither read into it things which are not there nor amend it by construction. *Allen v. Employment Security Dept.*, 83 Wn.2d 145, 148, 516 P.2d 1032 (1973). "Marital status" by definition means a state of marriage.[4] "Domestic responsibility" has been defined to mean: "obligations or duties relating to the individual's home circumstances or immediate family". WAC 192-16-015.[5] If the statute is interpreted to apply to a single person contemplating marriage 7 days later, can it also apply to one contemplating marriage 7 weeks or 7 months later? Without the certainty of a fixed point in time upon which to base determinations of this type, administrators as well as claimants will be hamstrung in implementing the act as well as applying for

---

[4]Black's Law Dictionary (5th ed. 1979) defines "status" as a "state or condition." The Latin derivative of "marital" is marita (um) meaning matrimonial or nuptial. *See Cassell's New Latin Dictionary* (1968). *See also Webster's Third New International Dictionary* (1969), which defines marital [marita] as relating to marriage or the state of marriage; the *Oxford English Dictionary,* vol. 6 (1970) defines "marital" as pertaining to marriage or the marital state.

[5]We note RCW 50.32.150 states in part:

> In all court proceedings under or pursuant to this title the decision of the commissioner shall be prima facie correct, and the burden of proof shall be upon the party attacking the same.

Although the commissioner noted Ms. Yamauchi voluntarily quit her job because she "had things to do before the wedding", the record was barren of details explaining to the hearing board what "things" she had to do in preparation of marriage which would rise to compelling personal reasons. *See Cowles Publishing Co., supra.* We are mindful, however, that in certain circumstances, not found in the instant case, the term, "domestic responsibilities", may be applicable to persons not married, *e.g.,* single parents.

its benefits.[6] Although we note RCW 50.01.010 provides for a liberal construction of RCW Title 50, the preamble does not mean courts can substitute ambiguity for clarity. Our legislature has not *expressly* provided benefits to individuals who leave work in preparation of marriage, whereas at least one other state has done so.[7] Although we realize a young woman or man may have many arrangements to make prior to marriage, here, we will not by judicial fiat do what the Washington legislature has not done.[8] We find that interpretation of RCW 50.20.050(4) requires the date of marriage to be the bright line for receipt of benefits under RCW Title 50.

---

[6]During oral argument this court posed the potential problems of domestic responsibilities found in today's society. Did the legislature intend to grant unemployment benefits to those people living together without the marital contract, who may (or may not) contemplate marriage, but are required to terminate employment due to a transfer to a different city?

[7]Our sister state of Oregon specifically allows receipt of benefits if it is found "[t]he individual left work to be married". ORS 657.176(3)(a). In 1973 the Oregon legislature revised its Employment Security Act and provided a disqualification provision similar to RCW 50.20.050(4). ORS 657.176(3) provides in part:

> (3) An individual shall be disqualified from the receipt of benefits until he has performed service for which remuneration is received equal to or in excess of his weekly benefit amount in one week subsequent to any week in which the act causing the disqualification occurs if the authorized representative designated by the assistant director finds:
> (a) *The individual left work to be married, or*
> (b) The individual left work to accompany her or his spouse or companion or join her or him at a place from which it is impractical to commute to such work, or
> (c) The individual left work because of his or her *marital status or domestic duties.*

(Italics ours.)

[8]Other jurisdictions adopting the position that "good cause" does not encompass terminating employment in preparation of marriage include: *Ogier v. Daniels,* 268 Ark. 1151, 599 S.W.2d 150 (Ct. App. 1980); *Gatz Ins. Agency, Inc. v. Chamberlain,* 267 Ark. 319, 590 S.W.2d 283 (1979); *Cooper v. Doyal,* 205 So. 2d 59 (La. App. 1967); *Moore v. Bureau of Unemployment Compensation,* 73 Ohio App. 362, 56 N.E.2d 520 (1943); *Wood v. Unemployment Compensation Bd. of Review,* 204 Pa. Super. Ct. 387, 204 A.2d 294 (1964); *Murphy v. Fascio,* 115 R.I. 33, 340 A.2d 137 (1975).

Judgment of the Superior Court is reversed.[9]

GREEN and MUNSON, JJ., concur.

Reconsideration denied April 21, 1981.

Review granted by Supreme Court June 26, 1981.

---

[9]Ms. Yamauchi also contends the court erred in refusing to compel the department to pay attorney fees immediately after trial; however, she fails to cite authority to support this contention. Such an assignment need not be considered by this court unless it is well taken on its face. *State v. Yallup,* 25 Wn. App. 603, 606–07, 608 P.2d 651 (1980). The contention is not well taken on its face since she is asking this court to pay her attorney before a final determination has been reached. RCW 51.52.130 states:

If the decision . . . of the board is reversed or modified . . . then the attorney's fee fixed by the court . . . shall be payable . . .